OF THE STATE OF ARKANSAS. 469

TERM, 1857.]                    Moore et al. vs. Maxwell et al.

## MOORE ET AL. VS. MAXWELL ET AL.

Though the soldier was restricted in the sale of his bounty land, granted by act of Congress of the 6th May, 1812, until the patent had issued; yet no such restriction being imposed by the act of 22d May, 1826, nor those of 23d March, 1830 and 27th May, 1840, reviving and extending the benefits of the act of 1826, he had a perfect right, under our laws and usages, to sell at any time his right to re-locate, where he had relinquished the land originally located and surrendered the patent, as provided by the act of 1826.

It would be irregular to make a location of a claim to public land, after the death of the person entitled, under a power of attorney granted by him, unless such power were coupled with an interest.

Parties and persons interested are competent witnesses in respect to the facts and circumstances necessary to lay a foundation for secondary evidence of a writing—as that a search has been made for it, and it cannot be found; and where no suspicion hangs over the instrument, or that it is designedly withheld, all that ought to be required is reasonable diligence to obtain the original.

An administrator is a competent witness to prove the existence, loss and contents of a bond for title, given by his intestate, for an interest in land sold by him in his life time; though the administrator has, in pursuance of law, executed a deed, with warranty, to the purchaser, in accordance with the bond.

A party, who sells, for a valuable consideration, land for which no patent has been issued by the Government, giving his bond for title, holds the legal title, upon the issuance of the patent, as trustee for his vendee; and upon his death his heirs would hold it charged with the same trust; and so an act of the Legislature merely authorizing the administrator of the vendor in such case to execute a conveyance of the legal title to the purchaser, as provided in the bond for title, is not liable to the objection of unconstitutionality.

This Court will not reverse a judgment in favor of the defendants below, where the case, as established by the testimony and the law, clearly shows that the plaintiffs were not entitled to recover to any extent, and the defendants have shown legal title sufficient on their part to defeat the action altogether, no matter what error may have been committed by the Court below.

*Appeal from the Circuit Court of White county.*

The Hon. BEAUFORT H. NEELY, Circuit Judge.

FOWLER for the appellants.

WATKINS & GALLAGHER and
WM. BYERS for the appellees.

It is true that the military bounty act of 1812, contained a prohibition against any sale or assignment by the soldier of his bounty, until after the issuance of the patent, and declared all such assignments void. But on the 22d May, 1826, an act of Congress was passed, authorizing the soldier to surrender and *re-convey* to the United States the bounty tract which had been *patented* to him, and to locate in lieu of it a like quantity of the public land within the military district, on proof to the satisfaction of the proper Register and Receiver that the tract originally patented to him was unfit for cultivation, and that his right to it had not been divested or incumbered by sale or otherwise; and in order to entitle himself to the benefits of the act, the soldier must have *removed* to the Territory of Arkansas, with a view to *actual settlement* on the land drawn by him. This act was revived and extended by various acts, until the act of the 27th of May, 1840, which revived and extended it for five years from that date. Such rights to locate were called " floats," and as proved in this case, and indeed a part of the public history of the country, were the common subject of sale and transfer. Neither the act of 1826, nor any of the subsequent acts extending it, contained any restriction whatever against alienation, and no presumption ought to be indulged in favor of a restraint on alienation, when no conceivable reason continued to exist, which might be supposed to have influenced the prohibition in the first instance. The soldier had become a settler, fully cognizant of all his rights, receiving his certificate of a floating right, not as a mere gratuity, but upon consideration of re-conveying to the Government the land originally patented to him. At the time McVey sold his right of float to Wm. Pelham, the act of 1830, authorizing such floats, was in force. If it was a power *coupled with an interest*, it did not cease after McVey's death. But if it was a mere naked

power, it *did cease*, and the location, etc., was *void*, and the plaintiffs, as heirs of McVey, cannot claim under it.

This restriction against assignment in the bounty act of 1812, is not included within the terms, spirit or policy of the acts of 1826, 1830 and 1840, allowing floats. Here, the sale was not of the land drawn by the soldier, but of his floating right, a mere chose in action, (*Mulhollan vs. Thompson*, 13 *Ark*. 232); and after all the purposes of the act of 1812 had been accomplished. McVey, in receiving pay for the sale of his float, would be guilty of an immoral and fraudulent act, to attempt to repudiate it. Besides, according to the whole theory of our Government, laws restricting alienation are to be strictly construed, and not extended without an express intention appears. It is inconsistent with the nature of property, if the individual owning property, or a right to property, has not the power to alienate it. 4 *Kent Com*. 479.

The fact of the existence of the bond for title executed by McVey to Pelham is undeniable; was its loss sufficiently proven? Ordinarily, and when the case is free from suspicion, as in the present instance, the loss of a paper is sufficiently proved by the oath of the party interested in its preservation or production. See 1 *Greenleaf's Ev.*, sec. 349, and cases there cited.

For the purpose of proving the loss of the bond, the deposition of Golden is admissible of course, and without any tenable objection to his competency on the score of interest. The loss of such a paper, after the lapse of so many years, and after it had fulfilled its office, and ceased to be of value to any one, might well be presumed.

Where a bond has been surrendered to the obligor, the presumption is, that it has been destroyed, and parol evidence of its contents is admissible. *Whitmore vs. Moore*, 9 *Dana* 315; *Bouldin vs. Massie*, 7 *Wheat*. 122. In regard to the proof of the loss of an instrument, there is a distinction between such papers as have ceased to be of any value, or any evidence of title, and such as are muniments of title. As to *the former*, the slightest proof of loss is sufficient to entitle the party to give parol evi-

dence of their contents; but as to latter, the rule is more strict. *Jackson vs. Root*, 18 *John. Rep.* 60. Nor does the strict rule ever apply where the loss was not occasioned by the fault or neglect of the party claiming a benefit under the lost paper, and who was entitled to the custody of it. Even if Pelham, though not entitled to the custody of the bond after it had been fulfilled by the execution of the deed, had retained it, the case might be different. But here, the administrator and heirs of McVey, being in privity with him, the case stands precisely as if McVey had executed the deed, and taken up his bond for title, and failed to produce it at the instance, and for the protection of his vendee. Under such circumstances, suspicion, if there was any ground for it at all, would attach to him and not to Pelham. See *Rennor vs. Bank of Columbia*, 9 *Wheat.* 597.

Where one is in possession of an instrument, under which he claims a benefit, and to the custody of which he is entitled, and it is lost or destroyed, he is permitted to prove its contents, with reasonable certainty, by the next best evidence in his power. Where no circumstances of suspicion appear, no great degree of strictness is, or ought to be, required, in establishing the lost paper. If, on the contrary, there are circumstances of suspicion, (and they are ever varying in their combinations,) the secondary evidence would be received with caution and weighed with jealousy. On the other hand, where a party is in possession of an instrument, under which, as against him, another claims a benefit, and the instrument is lost or destroyed, only slight evidence is required, of the contents of the lost instrument, from the person entitled to a benefit under it, and who is no wise responsible for its loss. Under some circumstances, every intendment would be against the party alleging the loss, and thus refusing to produce the instrument. Pelham surrendered the bond; and, by so doing, he, and those claiming under him, became fairly entitled to the benefit of the rule, as we have stated it. On this point, we refer the Court to the following authorities: *Jackson vs. McVey*, 18 *Johnson* 330; *Thayer vs. Middlesex Co.*, 10 *Pick.* 329; *Betts vs. Jackson*, 6 *Wend.* 173;

*Jackson vs. Root,* 18 *John.* 60; *May vs. Hill,* 5 *Littell* 309; *McIntyre vs. Funk, Lit. Sel. Cas.* 427; 6 *Watts* 164; 7 *Peters* 99.

As to the question of fact, whether the jury were warranted, from the evidence before them, in finding that the contents or purport of the lost instrument were sufficiently proved, it really seems too plain to require argument. The jury have settled that by their verdict.

The objection to the competency of the administrator of Mc-Vey as a witness, because he had given a deed with warranty of title, can be satisfactorily answered. From the necessity of the case, he was a competent witness to prove facts connected with the description, existence and loss of the instrument, not only before the Court, as a foundation for the admission of secondary evidence, but on the main issue, because the fact of loss remained to be proved to the jury.

It is true that the administrator, in his deed, uses the words "grant, bargain and sell," which, under our statute, import a warranty, unless limited by other words in the deed. But the import of those words is limited by an express covenant of warranty, as against those claiming under his intestate, Allen McVey. So that the deed is really a quit-claim, and the utmost that can be made of it, according to its legal effect, is, that it would be, what is commonly termed, a special warranty, against the grantor, or those claiming under him.

The reason why an executor or administrator binds himself, personally, in ordinary contracts relative to the estate, is, that he has no principal to act for, and whom he can bind, within the scope of his authority; that he is supposed to have received the consideration, and is liable, personally, for the debt created by him; no matter in what capacity he assumes to act, or how he describes himself as administrator, etc.

But here, the deed was the fulfillment or completion of an outstanding obligation given by the intestate himself. At the time the deed was executed, there was an undoubted liability against McVey's estate, in favor of Pelham, either for the price paid for the float, and interest, or for specific performance of

31

the bond for title, according to its terms, whatever those terms may have been. And, by the general law, in force at the time, the administrator was the proper representative of the deceased to make title where the intestate had become bound, in his life time, in any contract for the conveyance of land. *Digest, Title* ADMINISTRATION, *section* 166. Land is made assets in his hands for the purpose of specific performance, as well as for the payment of debts. In making such conveyances of land sold, or agreed to be sold, by the intestate, the administrator must necessarily act in his representative capacity, as much so as he would in suing upon a note executed to the intestate. If we look, then, to the act, the leading idea of it is a conveyance by McVey's administrator. The deed recites the act, and expressly declares that it is made by Golden, in his capacity of administrator. Clearly, this is not a case, to which the authorities, holding an administrator personally bound, ought to apply.

The act of Assembly authorizing the administrator of McVey to convey, was passed after the issuance of the patent, and when the title was beyond the control of the Government, and *so far as the legal title is concerned*, the question is not whether the Legislature ought to have passed such an act, but the question is, had that body *the power;* just as the question is, whether a court has jurisdiction.

This court has announced its determination not to declare an act of the General Assembly void, the highest conceivable exercise of judicial power, in a doubtful case, or in any case where the act can be so construed as to be upheld without clearly violating the organic law. *Eason vs. The State*, 6 *Eng.* 481. *The State vs. Fairchild*, 15 *Ark.* 690. See, also, *Bennett vs. Boggs*, 1 *Baldwin Rep.* 74; *Stark ads. vs. McGowan*, 1 *Nott & McCord* 401. *Bradd vs. Bramfield*, 2 *Serg. & Watts* 285, to show that the whole case turns on the inquiry, whether there is any constitutional provision, restraining the State from exercising the power in the particular instance.

Acts of the character of the one now under consideration, and much stronger ones, are to be found upon the statute books

of most of the States of the Union, and in States where there is the same division of the powers of the Government into three distinct departments. Such legislation has been frequent in our own State. See the cases of *Edward vs. Pope,* 3 *Scam.* 471. *Watkins vs. Holman,* 16 *Peters* 25. *Shehan's heirs vs. Barnett's heirs,* 6 *Mon.* 593. *Coe vs. Douglass,* 8 *Blackf.* 10. 12 *Ala.* 369. 2 *Peters* 660. 16 *Mass.* 326.

Mr. Justice SCOTT delivered the opinion of the Court.

This was an appeal from the law side of the White Circuit Court. The action was ejectment. The land in controversy was the N. E. quarter of section 10, Township 7 North of Range 7 West, containing one hundred and sixty acres.

All the parties claim under a patent for the land issued to Allen McVey, by the Federal Government, 24th of May, A. D. 1842. This man, Allen McVey, was a soldier in the war of 1812, in Baker's Company, 1st Regiment of Infantry. Having been entitled to bounty land for his services in the war, under the act of Congress, he drew a quarter section, under the act of the 6th of May, 1812, in the military district of Arkansas, which was patented to him on the 27th day of November, A. D. 1820. It was provided in this act of the 6th May, 1812, " that no claim for the military land bounties aforesaid shall be assignable or transferable in any manner whatsoever, until after a patent shall have been granted in the manner aforesaid. All sales, mortgages, contracts or agreements, of any nature whatsoever, made prior thereto, for the purpose or with the intent of alienating, pledging or mortgaging any such claim, are hereby declared, and shall be held, null and void; nor shall any tract of land, granted as aforesaid, be liable to be taken in execution, or sold, on account of any such sale, mortgage, contract or agreement, or on account of any debt contracted prior to the date of the patent, either by the person originally entitled to the land, or by his heirs or legal representatives, or by virtue of any process or suit at law, or judgment of Court, against a person entitled to receive his patent as aforesaid." (1 *Vol. Land Laws,* p. 215, secs. 2 and 4.

By an act of Congress, approved the 22d of May, 1826, it was made lawful for any soldier in the war of 1812, to whom bounty land had been patented in the Territory of Arkansas, and which land was unfit for cultivation, and " who had removed, or should thereafter remove to said Territory with a view of actual settlement on the lands by them drawn " to surrender the patent and release his interest to the government in the lands patented to him, and to locate another quarter section in lieu of the one surrendered; " provided that such surrender and re-location shall be made on or before the 1st day of January, A. D. 1830." (*Ib. p.* 418, 419.)

This act imposed no restrictions whatever upon the right to sell the privilege secured to re-locate, or the land that might thereunder be located.

On the 23d of March, 1830, Congress passed another act continuing in force this act of the 22d of May, 1836, for the term of five years; and extending its provisions to those having like claims in the States of Illinois and Missouri. (*Ib. p.* 458.)

In the year 1832, Allen McVey was a resident citizen of Arkansas, and remained so until his death, which occurred in Independence county, in the year 1836. And on the 3d of January, 1837, administration upon his estate was regularly granted to Eli Golden.

It seems that, in 1832 or 1833, McVey ascertained by the assistance of William Pelham, who was a surveyor, and went with him upon the land, that the tract patented to him was unfit for cultivation, and that he took steps to obtain a float upon another tract, under the provisions of the above cited acts of Congress. And that at that time he made a conditional bargain to sell the float to Pelham. That afterwards, when he had obtained the float, and on the 6th of January, A. D. 1834, he sold it to Pelham, for a hundred and fifty, or two hundred dollars, which was paid to him, and that he then executed to Pelham a bond to convey to him the land upon which the float might be located; and also executed a power of attorney to Pelham authorizing him to locate his floating right in his name, and to receive the patent therefor.

On the 27th of May, 1840, (5*th vol. Stat. at Large*,) Congress passed another act reviving the act of the 26th May, 1826, and continuing it in force for five years, and extending its benefits to those having like claims in the States of Illinois and Missouri.

In none of the several acts, after that of May, 1812, were there any restrictions upon alienation.

On the 1st of May, 1841, the Register and Receiver of the land office in Little Rock issued an official certificate to the effect, that from the original patent issued to McVey, in 1820, which he had surrendered, and other papers in the land office showing his relinquishment of all title to the land patented to him, and that he had otherwise fully complied with all the provisions of the several acts of Congress in the premises, he was entitled and " is hereby authorized to locate another tract of land, in any portion of said tract appropriated, etc., in lieu of the tract surrendered, etc., agreeably to the said act of Congress.

In March, 1842, under authority of this certificate and these acts of Congress, the land in controversy was located in the name of Allen McVey, on an application in his name "by William Pelham, attorney in fact," and was duly patented the 24th May, 1842. Under which patent, as we have said, all the parties in this controversy claim the land in question.

On the 26th day of December, 1842, the following copied act of the Legislature of Arkansas was approved by the Governor, to wit:

" *An act authorizing the administrator of Allen McVey, dec'd, to convey certain lands:*—Whereas, Allen McVey, now deceased, was entitled to re-locate one quarter section of land, in lieu of the bounty lands previously patented to him as a soldier of the late war, and by his obligation dated the 6th of January, 1834, covenanted for a valuable consideration paid him, to convey in fee simple, to William Pelham, the lands which might be so re-located, as soon as a patent therefor should issue; and whereas, said patent hath issued, and the said Allen McVey hath, since the making of said covenant, departed this life; Therefore, *Be it enacted*, etc., that the administrator of the said Allen McVey,

478 CASES IN THE SUPREME COURT

Moore et al. vs. Maxwell et al. [January

deceased shall be, and he is hereby authorized and empowered to make, sign, seal, execute and deliver unto William Pelham, his heirs and assigns, a good and sufficient deed in fee simple for the quarter section of land so re-located and patented, describing therein the said lands agreeably to the patent, and the consideration paid to McVey in his life time.

Sec. 2. *And be it further enacted,* That said conveyance by said administrator shall have the same force and effect as if made by the said Allen McVey in his lifetime."

On the 3d day of January, 1843, Golden, as administrator of McVey, conveyed the land in question to Pelham, by his deed of that date, in which the land is described, and in which deed there is the following clause, to wit: " I do, by power granted to me by an act of the legislature of the State of Arkansas, approved the 26th of Dec., 1842, entitled " an act authorizing the administrator of Allen McVey, deceased, to convey certain lands, for the consideration of one hundred and thirty dollars as aforesaid paid to the said Allen McVey during his lifetime, grant, bargain and sell unto the said William Pelham, his heirs and assigns, all the right, title and interest, property, and claim of the said Allen McVey, dec'd, in and to the said land before described; to have and to hold the same unto him the said William Pelham, his heirs and assigns forever, and I do hereby covenant to and with the said William Pelham, his heirs and assigns, as administrator as aforesaid of Allen McVey, dec'd, to defend the title to the said land to him the said William Pelham, from all and every one claiming under the raid Allen McVey aforesaid."

On the 1st of June, 1847, Wm. Pelham and wife, regularly, by deed, conveyed the tract of land in controvesy to the defendant Israel Moore in fee, which deed was duly recorded a few days afterwards- The other defendants hold, under Moore, separate parcels of the land in controversy. The town of Searcy having been laid out upon the quarter section, these separate parcels are town lots obtained from Moore, the common proprietor.

On the other hand, the plaintiffs below claim under deeds to

Maxwell & Walker, from several persons claiming to be the collateral kindred of Allen McVey, who, it is alleged, died without issue, and without father or mother him surviving.

Upon the evidence adduced, and under the instructions given, the jury found all the defendants not guilty, and the cause was brought here by the plaintiffs below, by appeal.    And here they insist upon various matters saved by exception during the course of the trial in the Court below.

Several of these matters it will be unnecessary to consider, as they relate merely to the extent of recovery, and pre-suppose that the case made by the plaintiffs upon the pleadings and evidence, to be sufficiently strong to authorize a recovery from the defendants.    This latter, the defendants below deny, *in toto*, and submit that no matter what error, if any, may have been committed by the Court below, enough appears on the record to show that the appellants were not entitled to recover to any extent, and on the other hand, that they, the appellees, have showed right sufficient on their part to defeat the action altogether.

As to McVey's right to sell his floating right and its fruits, we think no serious doubts can be entertained under our laws and usages, which allow such great scope to alienation, in the absence of express restrictions.    The restrictions as to bounty lands under the act of Congress of 1812, did not extend beyond the issuance of the patent for the land.    After that, the soldier enjoyed the ordinary privilege of alienation.

Under the act of 1826, and the subsequent ones, which were passed from time to time to continue it in force and extend its benefits, no restrictions upon alienation were imposed.    The full right of alienation had before attached to the land allowed to be released to the government, and this was fully recognized by these latter acts, in the provisions contained in them, guarding against such alienation previous to surrender and release to the government.    These acts dealt with the soldier no longer as a minor, liable to squander his property, but as a citizen of the State or Territory, to which they contemplated he had removed, for the purpose of actual settlement, with the ordinary ca-

pacity of a citizen to take care of his own interest. They gave him new and substantial rights, in lieu of those which, although perfect, were of comparative little value; and imposed no restrictions upon the alienation of these new rights. So totally inconsistent is it with the nature of property rights, that the owner should not be authorized to alienate them; and so much at war are such restrictions with the public policy of our day in this country as to property rights, that all laws imposing such restrictions are strictly construed; and of course can never be extended by liberal construction to cases not within their express provision.

Besides, in this case, when the appellants question the right of McVey to alienate his floating right, they thereby question the regularity of the patent under which they themselves claim; since it issued upon a location made after the death of McVey under a power in Pelham granted previously; which, if a naked one, must have ceased on the death of McVey, and could have lived afterwards only upon the ground that it was coupled with an interest conveyed to Pelham, the grantee of the power. But when considered in the latter view the regularity of the patent is beyond question, under the provisions of the act of Congress of the 20th of May, 1836, although issued upon a location made after the death of the patentee. (See, as bearing upon the point, the case of *Galloway vs. Finley et al.*, 12 *Peter's R.* 296.)

Upon exceptions reserved by the appellant to the admission of evidence on the part of the defendant touching the alleged lost bond for title from McVey to Pelham, it is insisted that the existence and loss of the supposed bond were not sufficiently established to lay the foundation for secondary evidence of its contents.

The law touching the questions involved in this point, is expressed in such few words by the Supreme Court of Alabama, in one of the cases cited by the appellants' counsel—that of *Juzan et al. vs. Toulman*, 9 *Ala. R.* 691–'2—we will extract it here before proceeding to notice the testimony in connection with these principles of the law.

"Parties and persons interested are recognized as competent

witnesses in respect to the facts and circumstances necessary to lay a foundation for secondary evidence of a writing, as that a search has been made, and it cannot be found (3 *Phil. Ev. Notes, C. & H.* 1218–'19, and cases there cited.) No certain rule can be laid down as to the proof necessary to establish a loss; the degree of diligence must depend on the nature of the transaction to which the paper relates, its apparent value, and other circumstances.

" The rigor of the common law, it is said, has been relaxed in this respect, and the non-production of instruments is now excused for reasons more general and less specific, upon grounds more broad and liberal than were formerly admitted. If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons of its non-production. But when there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original; in fact, Courts in such cases are extremely liberal. (3 *Phil. Ev. Notes, C. & H.* 1223–1233. 1 *Stark Ev.* 349 *to* 354. 1 *Amr. Ed. Greenl. Ev.* 593–'4.) In *Moredecai vs. Beall,* 8 *Porter R.* 529, the plaintiff proved that a deed under which he claimed had once existed, and traced it to the possession of a third person, who had intermarried with the grantee, a female; proved that it had been demanded of that person, who failed to produce it, and that he now resided in another State. Further, that search and inquiry had been made of others, who, it was supposed, might have the deed, but without effect. It was held that the preliminary proof was sufficient, and as it could not be intended that the plaintiff had any motive in withholding it, a copy from the records of the Court was admissible. To the same effect is *Swift vs. Fitzhugh,* 9 *Porter R.* 39. *Beall vs. Dearing,* 7 *Ala. R.* 124."

In the case before us there are no facts or circumstances in proof to authorize any suspicion of the want of genuineness in the alleged lost bond, or that it was designedly withheld on the part of the defendants, or those under whom they claim. On the contrary, there is satisfactory testimony as to facts and circumstances, from which the very opposite is to be inferred.

Charles H. Pelham not only testifies to the actual execution of
the bond, but of the several matters which preceded it—the as-
certainment by McVey that the land originally patented to him
was unfit for cultivation—his application for a float in conse-
quence of that discovery—the conditional bargain of William
Pelham with him for its purchase in case he should obtain the
float—the actual purchase and sale of the float, when it was
ascertained it could be had—the payment of the purchase mo-
ney therefor—and the execution of the bond and power of attor-
ney.    This is all corroborated by other testimony, and especial-
ly by the deposition of James E. Pelham.    Had the appellants
by their counsel attended and cross-examined these witnesses as
to the grounds of their knowledge of the facts about which
they speak in their depositions, doubtless they might have re-
duced some of their general expressions to greater particulari-
ty, and might possibly have derived some benefit therefrom.
But, as they did not think proper to do so, they cannot now be
heard to complain of any fancied consequence of their own
neglect; and the fact, that they did not cross-examine, author-
rizes the inference that the more minute matter, that might have
been sifted out, would have been against them, or at any rate
would not have been in their favor.    Besides this, the facts
shown in evidence, that William Pelham gave up the bond
upon the execution of the deed, and that Golden should have,
without a suit, executed the deed in pursuance of the act of
the Legislature, which was not mandatory to him, but merely
authorized him to do so, both strongly speak for the genuine-
ness of the bond.    Golden, besides being the administrator of Mc-
Vey, and thus sworn to protect the rights pertaining to his es-
tate, seems to have been his relative and friend.    And Pelham,
had not the bond been genuine, would have more likely in-
structed it to have been destroyed, upon the execution of the
deed, than delivered up to Golden.    And the evidence even
more satisfactorily proves that the alleged lost bond was
not designedly withheld either by the defendants, or those un-
der whom they claim; because it is almost conclusively estab-
lished, by concurring witnesses, that it was actually delivered

OF THE STATE OF ARKANSAS. **483**

TERM, 1857.]                Moore et al. vs. Maxwell et al.

up to Golden; and that is the last account of it, although the most diligent search was made, on the part of the defendants, in all the places to which they could have access, where there was the least probability it might be found, besides repeated applications to Golden, with requests to him to search his archives.

There can be no reason, then, upon either of these two grounds, why the case at bar should be supposed to be governed by the rules which demand the most rigid inquiry as to the alleged existence and loss of the instrument; on the contrary, the more liberal rule is clearly applicable, not only because exempt from all suspicion as to these two matters, but also because having been in effect surrendered to the obligor—his administrator—upon the execution of the deed it was designed to secure, it thus served its purpose; passed from the hands of those who, regarding it of value, would have been stimulated to take care of it; and laid a foundation on which presumption of its loss or destruction arises more violent than would have attached had it remained in the hands of the obligee, or those claiming under him.

Under these circumstances, we think it perfectly clear that the evidence adduced was amply sufficient. Indeed it is not easy to conceive how the nature of the case could have admitted of any better evidence than was produced to the points. This evidence was produced some ten years after the bond was delivered up to the administrator, when, it is reasonably to be supposed, the parties then interested considered the affair forever ended and closed; and it conduces to prove very distinctly that when the deed was executed before Kyler, the justice of the peace who took and certified the acknowledgment, the bond was produced, and that after the business was transacted some conversation arose as to who should take the bond. That Pelham desired Golden to take it, but he did not want it, though he was finally induced, by the joint suggestions of Pelham and Kyler, to take it, for the purpose of filing it among the administration papers of McVey's estate, and that Golden then took the bond into his possession.

Besides the usual affidavit of the defendant, Moore, as to the existence and loss of the instrument, there was the affidavit of his counsel, Mr. Curran, not only as to a search for the bond in the office of the Secretary of State, where it was possible it might have been left when it was before the Legislature; but also of an application to Golden, the administrator, with a request to him to search among his papers for it: also an affidavit of McConaughey to the effect that he had gone to Clark county, (whither Golden had removed from the county of Independence,) at the instance of the defendant, Moore, and made another application to Golden for the bond, and for a search for it: also the deposition of Kyler, and finally the deposition of Golden himself, who testified as follows: " The deed was executed by me at the residence of John Kyler, of Independence county; said Kyler was then an acting justice of the peace for said county. At the time I executed the deed, James E. Pelham, who acted as the agent of his brother, William Pelham, produced the bond executed by McVey to William Pelham in his lifetime, and also said act of the Legislature, (I believe the purport of the bond was correctly recited in said act,) and that said bond is not now in my possession, nor do I know what has become of it. At the time I made and acknowledged the deed, said Kyler told me to take the bond, that it belonged to me; but if I took it from his office, I am unable to say what has become of it: I know that it is not in my possession or control."

If the appellants, by their counsel, had attended and cross-examined Golden, when his deposition was taken, as to the grounds of his knowledge of the matter about which he testified, fied, it is not impossible that they have learned from him that he knew the bond was not in his possession or control, because he had made diligent search for it. That he knew it was executed by McVey, because he was acquainted with his handwriting, and had heard him say, in his lifetime, that he had executed such a bond to Pelham; and that he knew it was a bond, because it had a proper attestation clause, with a seal or scroll annexed to the signature.

OF THE STATE OF ARKANSAS. 485

TERM, 1857.]            Moore et al. vs. Maxwell et al.

We think it equally clear, also, that the jury were warranted, from the evidence before them, in finding that the contents or purport of the lost instrument was sufficiently proved. Besides the depositions of the two Pelhams and of Kyler, there was also the deposition of *Lineberger*, which was, in substance the same as Kyler's, he having been present when the deed was executed, and attested it as a subscribing witness; and of *Elias N. Conway*, who, among other matters, testified as follows: "I recollect of having seen and examined the bond for title from Allen McVey (I think that was the name) to William Pelham, for the land that might be selected and patented under his boun-ty float. The same claim was located on the north-east quarter of section ten, township seven north, range seven west. I think the bond referred to was before the Legislature at the time the act was passed authorizing McVey's administrator to convey said tract to William Pelham. I do not know what ever became of said bond. I do not recollect the details of the bond referred to, from McVey to Pelham, but I well recollect that the terms or conditions of it were substantially this: that upon payment of the consideration named in the bond, and upon, or after the issuance of the patent for the land that might be located with the float, McVey obligated himself to convey such land to William Pelham. I do not know anything further, material, except that a good many circumstances have impressed the foregoing facts upon my memory."

Besides this testimony there was the power of attorney, contemporaneous with the bond for title, from McVey to Pelham, authorizing him to locate the float and receive the patent; the location of the float by Pelham, and the possession of the patent under its authority: the fact proven of the sale of the float to Pelham and that he had paid for it a full and fair price; the act of the Legislature, with the bond before that body; the simultaneous execution of the deed and surrender of the title bond, under the authority of that act; and an evident publicity, notoriety, and apparent fairness throughout the whole transaction.

With regard to the objection, that the evidence is defective

486 CASES IN THE SUPREME COURT

Moore et al. vs. Maxwell et al. [JANUARY

and wanting in minuteness of details as to the terms, conditions and phraseology of the bond, and as to its supposed attestation clause, and its sealing in fact, or by way of a scroll, that has already been incidentally noticed; but in this State, under our laws, and the common usages of our people in reference to the sale and transfer of such land-rights, in a brief, summary and comprehensive mode, regarding the substance more than form, (*Smith vs. Robinson*, 13 *Ark. R.* 539, *Moore & Cail vs. Anders*, 14 *Ark. R.* 693,) such minuteness of detail, in reference to legal technicality, would have full as much tendency to confuse and bewilder the jury, as connected with their practical knowledge of such matter, as to give them clearer light; nor, indeed, could the matter, as to whether the supposed bond was, in truth, in point of law, technically so or not, be of any great practical importance in any view, provided it was sufficient substantially to satisfy the statute of frauds in its provisions as to the sale of lands.

There are two other exceptions reserved relating to admissibility of evidence, which, it is insisted, may have improperly influenced the finding of the jury. The one, as to the competency of Golden's testimony, and the other, as to the constitutionality of the act of the Legislature, and the admissibility of the deed executed under its authority.

With regard to the former, the authority already recited from 9th Alabama Reports 691, shows that, although Golden might have been interested, his testimony was competent in respect to all the facts and circumstances within his knowledge necessary to lay a foundation for secondary evidence of the lost bond, and when his deposition is closely scrutinized it is to be doubted whether there is any material matter stated therein that does not legitimately pertain to the establishment of the existence and loss of the instrument in question, either by way of identification, or as showing the foundation of his knowledge of the matter about which he testified relative to such existence and loss.

But upon the ground assumed, to wit, that Golden had *warranted* the title in his official deed to Pelham—it is, by no means,

clear that in any view he was a legally incompetent witness, on the score of interest, to testify as he did, supposing him to have gone beyond the mere laying of a foundation for secondary evidence, under the peculiar circumstances of this case. Because, according to the authorities cited to the point by the appellants' counsel, (*Bird vs. Holloway,* 6 *Sm. & M.* 203. *Robinson vs. Jones,* 14 *Sm. & M. R.* 169,) if Golden is responsible legally upon his warranty, it was for the double reason that it was in writing and upon a good consideration. And *Mr. Rawle,* in his work on *Covenants, p.* 423, places it, in principle, upon the same ground, when he supposes that the effect of fiduciary vendors pledging their personal responsibility is to excite the confidence of purchasers and thus induce them to give an enhanced price for the property sold. In this case, however, there was nothing either paid, or received as between the grantor and grantee, and in that view the contract of warranty was totally without consideration. But in another view there was a consideration, in the fact that the alleged lost bond for title was delivered up, and the deed was in satisfaction of the same. But if that was not genuine, or was otherwise invalid and not binding legally upon the estate, still there would be no consideration for the warranty, and that also would be invalid. If, on the contrary, the bond was genuine, and of obligatory force against the estate, there would be a consideration for the warranty. And it so happened that it was in support of this latter proposition that Golden testified in his deposition, and thus his testimony tended to fix his own liability upon the supposed warranty, and was therefore directly against his interest.

There is another view, more general, in which the result is the same as to the competency of Golden, under the peculiar circumstances of this case.

If he could be held liable upon this supposed warranty, it would be, as we have seen, because it was a contract of his upon a sufficient consideration—whether beneficial to him or not, not being material. And being a contract, it is subject to the ordinary rules governing the construction of contracts. Here, the contract is in writing, and although in terms a war-

ranty, those terms, as they appear in the clause of warranty in the deed, are not their own sole exponents in this case, as they would be had the previous colloquy between the parties been by parol, and not recited in the deed.   On the contrary, for their exposition in this case we have authority, in the recitals of the deed, to look both to the act of the Legislature, and to the bond recited therein, in order to come at the true meaning and intent of both the parties to this contract; and when we do so, we can find no reason to suppose that the one contracting party intended to pledge, or the other to receive in pledge, the individual responsibility of the grantor in the deed; on the contrary, that it was but an effort, on the part of both of them, to do, and have done, an act that was purely fiduciary, in especial reference to that clause of the special act, which provided " that said conveyance by said administrator shall have the same force and effect as if made by the said Allen McVey in his lifetime."   The grant and the warranty, by the terms of the deed, being expressly in virtue of the power and authority conferred upon the grantor by the act, which, it is fairly inferable, had been passed at the instance and for the sole benefit of the grantee to enable him to perfect his own title to the land in controversy, by obtaining what would be tantamount to the outstanding legal title, which was in the heirs of Allen McVey.

With regard to the objection to the act of the Legislature, under which Golden executed the deed to Pelham, for want of constitutionality—we are saved the necessity of considering any question as to the constitutionality of acts of the Legislature of that class, which authorizes the sale of the landed estates of deceased persons, and divests valuable property rights, although presented and discussed by counsel, because this act had no such operation.

According to the testimony in this case, upon the death of McVey, no such valuable property rights in the land in controversy vested in his heirs.   In his lifetime, he had already divested himself of any such valuable rights in the land to be located by his float, and none such could be cast upon his heirs by descent.   Had he lived until the land in controversy had been

located by his float and patented in his name, he would have been but the trustee of the legal title to the land for the benefit of his vendee, and his heirs but derived the same from him upon his death, charged in their hands with the same trusts.

This results from what we conceive was the true intent and meaning of both the parties to the contract of sale and purchase in question, as the same appears by all the testimony in the case, when considered together and in the light of the doctrines established by this Court, in the cases of *Smith vs Robinson* and *Moore & Cail vs. Anders*, before cited.

In the very nature of the transaction there was something more than an executory contract. It was an actual present sale and purchase, when the consideration was paid, and so far as it was practicable, the possession of the thing sold, by means of the power of attorney and the bond as for further assurance, was surrendered to the vendee. There was no withholding, upon the part of the vendee, of anything pertaining to the subject matter of the contract, which it was possible to surrender up to the vendee.

What remained with the vendor was but a dry legal title, which had not yet emanated from the government and could not, until after the vendee should think proper to exert some of the rights he had purchased and paid for; and even as to the evidence of that, the vendor had cut himself off from its possession by the execution of an irrevocable power of attorney to the vendee to apply for and receive it from the land officer, as soon as it should have been issued by the government. To suppose, under such circumstances, that the possession of the land, which it was the object of all these arrangements to obtain, was intended to be retained by the vendor, would be to stultify common sense by hoary legal ideas, that have no place in such a transaction; because such legal ideas never contemplated such an interest in land, and if they had done so, peremptorily forbid its transfer to another. So far was the common law from allowing one to sell land, before he had obtained it in actual possession, it was very loth to allow it even afterwards. But the very reverse is the policy of the law in this

**32**

country, generally; and, even more especially is it so in this State, where, under our statutory provisions, the right of alienation is without limit. Here, land rights, especially those inchoate and equitable ones which, under our land laws, are subject to be acquired before the emanation of the legal title from the government, are as freely the subject of trade and traffic, and are dealt with, in many respects, with almost as little regard to the form of the contract as personal property; and generally too, with as much adherence to possession, either actual or constructive; for the reason, that some of these rights live but in possession, and possession in all of them is a material element of value.

Hence, so far from there being any presumption that the possession is to remain with the vendor, when one of these land rights is sold and paid for, unless possession for the vendor be expressly stipulated for, the very opposite is the presumption here, whatever it may be in England or in New York, under different circumstances, upon a sale of an equitable estate in lands, or upon an executory contract for the sale of lands.

When, then, regarding the defendants' case, established by the evidence in this light, there was no margin for any unconstitutional operation of the act of the Legislature in question. The appellants, nor those under whom they claim, had any valuable rights to be invaded. Nothing was taken from them that was held by them for their own benefit. Indeed, in strictness, nothing whatever was taken from them under the operation of that act, but it simply imparted to the defendants' estate in the land, a grade of rank to which it has been now judicially ascertained they were entitled by law, which, for all practical purposes, would be tantamount to, and was henceforth to be as available to them as the outstanding dry legal title would have been if united to their equitable estate by a regular conveyance from those who, in legal contemplation, held it in trust for them.

The act, although it proceeded upon the ground that the contract of sale and purchase was valid in law, and that the purchase money had been paid, and that nothing remained to be

done to complete the contract between the parties, but the conveyance of the dry legal title outstanding in trust, nevertheless, did not undertake judicially to ascertain these matters, and peremptorily decree accordingly.

On the contrary, it was permissive only, and left these matters open to be judicially determined. Had the administrator doubted as to the genuineness of the bond, or had not been satisfied as to the fairness of the transaction, the Courts were open to determine any such contested points between him and the party claiming the conveyance at his hands, under the authority of the act. It appears, however, that he, voluntarily, upon application, acted under the law, and as he must be presumed to have done his sworn duty, it is fair to infer he was satisfied as to all these matters, as ordinarily an administrator would be, before he would pay a debt claimed against an estate without previous judicial ascertainment of its obligatory character.

With these views of the case established by the testimony, and the law, we feel clear to conclude that no matter what error, if any, may have been committed by the Court below, enough appears in the record to show that the appellants were not entitled to recover from the defendants, or any of them, to any extent; and on the other hand, that the defendants have shown legal right sufficient on their part to defeat the action altogether, in the full, legal and equitable ownership, and consequent rightful possession of the land in controversy.

It will, therefore, be totally unnecessary for us to go into an examination of the exceptions to the instructions given, and those refused. As to which, however, we are free to say, after some examination of the points discussed upon them, that when considered altogether, no material error was committed against the appellants, and that they were quite strong as against the defendants.

The judgment will be affirmed, with costs.

Absent, Hon. THOS. B. HANLY.